Will the clerk please call the last case? 4-18-0089 Lester Stevens v. The Workers' Compensation Commission 4-18-0089 Lester Stevens v. The Workers' Compensation Commission May it please the Court, my name is Bruce Shor and I represent Lester Stevens. The diseases contested in this case are CWP, chronic bronchitis, chronic cough and asthma. I'm going to confine my argument today to CWP and I'm going to rest on my brief for the other diseases. I'm not saying I yield on the others, I'm saying I rest on my brief. There's just not enough time to talk about CWP. And God works in mysterious ways. I'm going to quote to you, I'm going to start out with what was last on my agenda. I wanted to end with a big bang, I decided I'd better start with one. Dr. Tudor is a witness here for the company and it's ironic that this piece of evidence comes up in my last argument of eight. And here I'm going to quote from Dr. Tudor. I think this settles the matter. If you have somebody who is a coal miner for decades and you do a very careful autopsy looking for the diagnostic criteria of CWP, that is the presence of coal dust and adjacent fibrotic interstitial change associated with a coal dust macule and some nodules and possibly some emphysema, you will find it. That feels so good. I'd like to say it one more time if I can ask for that. Dr. Tudor said unequivocally, quote, if you have somebody who is a coal miner for decades and you do a very careful autopsy looking for the diagnostic criteria of CWP, that is the presence of coal dust and adjacent fibrotic interstitial change associated with a coal dust macule and some nodules and possibly some emphysema, you will find it. So if we take that as the unassailable maxim, though, I need to ask you about this because at least I think you'd have to concede we haven't seen anything like this this week in any of your cases. Tell me what you make of this. The Commission found that the chest X-rays interpretations of Dr. Cohen and Dr. Smith were inconsistent with the permanent nature of scarring and the opacities of the disease of CWP. In this record, the Commission observed Dr. Cohen's interpretation of Clayman's chest X-rays demonstrate the Clayman's condition regressed from the profusion of 1 to 1 in 2007 to a profusion of 1 to 0 in September 2008. Similarly, Dr. Smith's interpretations of the Clayman's chest X-rays demonstrated that the Clayman's opacities found in the upper lung zone in 2007 resolved and were not present on March 28th but reappeared six months later. Is that consistent with the nature of CWP? It's consistent with the nature of CWP but mostly consistent with the nature of chest X-rays. In other words, if I wanted to load this up, I'd call Dr. Smith and say, Hey, Dr. Smith, you get these three X-rays all in one day and here's what the court thinks about it. Do what you wish. But the disease itself doesn't wax and wane, does it? That's the point. The disease stays the same but the X-rays can wax and wane. But how does that help the credibility of these witnesses? It makes him more credible as a witness because he gets these X-rays one at a time. He says what he sees, even though we all know that the question you're asking can come up. But my comment to you is it's not because the disease changed. It doesn't. But this X-ray is taken at different facilities at different times with different equipment by different technicians. And even if it were taken at the same place with all the other stuff the same, two years later, clarity comes into effect, too. On the issue of the weight to be given to the testimony, how would that help you? One X-ray, the experts say it's there. One, they say it doesn't. Does that help your case? I don't. I'm sorry, Your Honor, I don't read it that way. What I read is Dr. Smith found it positive, positive, and positive. That's what counts. That's that second layer that's coming down on the flow chart. What did he say it meant? It meant it's positive. Did he say that he saw something different on it? Yes, he did. But that doesn't mean that CWP changes. It means that X-rays change. It means I give him more credibility for it because, like I said, it would be so easy to send all the X-rays on one day. But we don't. We send them when they come in. I think it adds credibility, Your Honor. However, that's a judgment that you make. It's up to you, not to me. But I say by Dr. Tudor's admission, when it comes back to the thing that applies to all these cases, when you get to Dr. Tudor's admission, and I say that Dr. Tudor has done more examinations of black lung than any other physician that I know of for the respondents, all for the respondents, for 30 years, federal and state black lung. He didn't show up in the other case because normally this company, for some reason, doesn't hire him. The others do. This one doesn't. But they did here. And that's what counts. This admission by Dr. Tudor makes it practically impossible to believe that Klayman does not, will not have CWP. Now, so if you take a Dr. Meyer statement of 50% or more and you compare it with Dr. Tudor, I'm still in good position because it's somewhere between 50% and 100%. What's my burden? More likely than not. Can I go back to this? Maybe I'm missing this point with Dr. Tudor. Did Dr. Tudor conclude that Klayman had no evidence of the presence of CWP or any other coal dust, coal mine dust-induced disease, and no evidence to support a diagnosis of any pulmonary primary condition? Did he make that conclusion? Yes, he did. Okay. Based on the chest X-ray. He can look at you honestly and say, I don't see any evidence of this on the X-ray. But then you ask him the real question. Yeah, but does the guy have it? Does the guy have it? Can he have it despite your negative reading? He said, well, yeah, notwithstanding my negative reading, he could still have it. And then he says why. But why is that so worth shattering it? Because that's been the argument all week. And I think we can see that you can have it, even after you leave the mine and it doesn't show up before then, right? Yeah, except I've got more chips on the table now. I was saying 50% or more. Now I've got the expert, the guy that's done more, saying 100%. And I think that's very critical when you start a case with an understanding that, hey, it is much more likely than not that this guy is going to have it. And then you start looking at the evidence. So let me lay that aside, if I could, and talk about this case in particular with what the arbitrator said. The arbitrator started out in the right direction but then veered off track. In the first page of the conclusions of the law, on the third paragraph, fourth sentence, here's what the arbitrator wrote. The arbitrator recognizes that petitioner's alleged condition of CWP may have developed in a time period subsequent to his final NIOSH x-ray of May 7, 2007. Eight for eight. That's what we've been saying the whole time. That's what we've been talking about. And this arbitrator says, I know that it could have. Now, with that arbitrator saying that, how can she cross herself and say something else? The universal testimony is that CWP can first manifest itself on x-ray after the date of last exposure. We know to the date, to the day, when he has to prove it by Section 1F. Trying to leave out some stuff we've already covered the ground on. This puts no burden to accept my theory. Puts no burden on the respondent. All they have to do is take their chest x-rays at the right time. They can take the same number that they're taking now. They just have to take them at the right time. So what I'm asking is not something that's unfair to either party or unduly burdensome to either party. They're still going to develop all the same evidence. Just do it at the right time. And then we can have this discussion over. Now, the NIOSH x-rays that this arbitrator relied on, despite the first sentence that the arbitrator said, they were taken in 1979. That's 32 years before 1F ran. She depended on that x-ray. 1993, 1998, May of 2007. After saying it could manifest itself after the most recent x-ray, still relied on all those x-rays. Dr. Wyatt read x-rays from 1999, 2002, February 2004, December 2004. Was there evidence introduced that a NIOSH A reader by the name of Redemaker and B reader by the name of Shipley read the June 1979 and September 1993 films as positive for CWP? I think, did they read it 1 over 0 or 0 over 1? I think they read it 0 over 1. I'd love to sit here and say yes. But I've got to say it. With the profusion of 0 over 1. Right. And 0 over 1 is the next step before positive. Now, what I argue with you is, hey, that means when you say 0 over 1, they saw opacities consistent with it, the right size, the right place. That's not quite enough. That's what 0 over 1 means. And I argue in that case when I got guys saying it's there and these guys saying, oh, there's none of it there. I take the 0-1 to say it goes my way. But I don't want to mislead this morning. And the truth is I don't think I need to on that evidence. 0 over 1 would still be technically negative. Which is what Wyatt testified to. Wyatt testified 0 over 1 is a negative film. Sure. It's negative. However, like I said, it means they saw stuff consistent. So, I mean, you know, my purpose here is not to persuade you, lead you off somewhere we don't want to be. It's to get that bright line down the middle so we can start agreeing on what these things are. So we can get some consistency from these decisions by the arbitrators and the commission. Now, none of Dr. Rosenberg's x-rays were timely. None of Dr. Wyatt's x-rays were timely. In an ironic twist, Dr. Rosenberg's report was written in April of 2009. That's just four months prior to the running of 1M. Now, I said his report because he did a records review. He didn't take an x-ray then. And what's interesting about that is that the employer, as a matter of tactics, made its calculation and determined it would not have Rosenberg do an exam, just a records review. They did this because they didn't want any more evidence to be developed after the testing of Dr. Paul because it might show worse PFTs. Now, but as a result of that calculation, by the artifice of depriving the commission of additional data, the employer deprived the commission of the data it needed to make an argument against CWP. The employer hoisted itself upon its own guitar. If the employer would have waited just four months to obtain that report and had the full exam to put all the evidence on the table, not to hide any of it, then they'd have had something to get traction on. We could argue on that. Playing games with the development of your evidence can sometimes come back to bite you. I think it did here. Now, the arbitrator further wrote, quote, the arbitrator further notes that although more temporally remote, all of the NIIB readers found that Petitia's X-rays of 79, 93, and 98 were negative for CWP. What can that mean? I think what it means is the arbitrator, in all fairness, they don't hear that many of these. I can understand if they would be wrong. The arbitrator didn't know what it meant to have X-rays that old. That's a fact, and I can say that without being ugly toward the arbitrator, but it's just a fact. By adding more, I used to say irrelevant, but now I say of no weight, by adding more X-rays of no weight to the pile, you don't make the pile heavier. That would be my point. By saying, oh, 79, 93, and 98, they were all negative, too, doesn't do anything. So the arbitrator also wrote that she relies on the opinions of the NIOSH physicians because NIOSH is the government agency responsible for administrating the health surveillance program for the benefit of coal miners, and NIOSH is not a party to this action, and the X-rays were taken or viewed for reasons independent of this litigation. First, NIOSH is not for the benefit of coal miners. It benefits the industry, too. That's the whole purpose of workers' compensation. So that part is just not true. But the next thing is, even if the arbitrator were right and the NIOSH screening program were for the benefit of coal miners, that fact would take away from any credibility that the arbitrator might gain from NIOSH not being a party to the litigation and from the X-rays being taken for reasons independent of litigation. Those things can't all live in the same house. Mr. Sorry, if I can ask a specific question. The arbitrator gave weight, was somewhat persuaded by the testimony of Dr. Meyer, noting that his background and experience in radiology, dereading, and CWP was more extensive than the claimant's screening physician, Dr. Paul. Would that be an inaccurate conclusion to draw? First, I've got to ask a dumb question. Headache cases. Was Dr. Meyer in this or just Dr. Weyer? This is Dr. Meyer. Okay, I'll just double-check. Right. The comment that you made, what you read from there, can be true and have no weight, no meaning. The fact that he is the greatest bee reader on earth doesn't change the date that the X-ray was taken. It doesn't change the questions on the table. And so I think he's a great reader. I think all these guys are great. I think all the bee readers can be the same, and they can all be right. And if we look at this in a rational way, take it to its most basic elements, we can come up with a good conclusion, and I say thank you very much for letting me go. Very good. You'll have time to reply. Yes. May it please the Court, Julie Webb on behalf of Freeman Cole. Justice Hudson, I'm sorry to disagree, but I do not believe Dr. Meyer was in this case. It was strictly Dr. Wyatt that read this. But as you point out, I think the arbitrator here did a wonderful job of going through and explaining why she found certain X-ray readings, certain interpreters to be more credible than others. Which isn't always the case. Exactly. That's what I was going to say. In many cases, Mr. Resorts, Wyatt, there seems to be conclusions unsupported by specific reasons being articulated. But I think that was a little bit different in this case. And I would agree totally. I think in this case, the arbitrator was very thorough in going through the list of all of the readers' chest X-rays that were interpreted and noting why he or she, sorry, she is the arbitrator, him and Wyatt, gave less weight to particular X-ray readings. And we talk about, you know, how is the commission to determine the credibility? That's what the commission has to decide. I mean, in this case, and I have a chart because I can't keep up with all the readings in this case, and I don't even count the X-rays, but, you know, we've got this many X-rays saying it's negative, this many readers saying they're positive. So how does the arbitrator and the commission make that conclusion? As Mr. Resort pointed out earlier this morning, they're not looking at the X-rays. They've got to look at these interpretations and somehow determine which one, which way they're going to resolve those conflicting opinions. And one way they do that is taking into consideration the testimony regarding how does CWP usually present itself. It doesn't say that it always presents itself in that manner, but we've got to look at it and see, is this a general progression, and the arbitrator addressed that with Dr. Smith's readings that they started out as first, earlier readings back from 1999, which I will point out, I don't know if those are giving, should be given any weight because they were well before he left coal mining, but showed that it was started in the mid and lower lung zones, had progressed to an upper lung zone on a reading in 2007, 2008, didn't see it in that upper lung zone. That shows that that's inconsistent with the general progression and permanency of CWP. For example, Dr. Soothe's B-reading here found a 1 over 0 perfusion with an abnormality in the lower left lung zone only. That's just way out there and not consistent with any of the other B-readers. Correct. There was nothing there that shows why that one would be consistent with the others. So here the arbitrator has looked at and the commission considered all of those chest x-rays and has spelled out which ones were more credible than others. That's the role of the commission to resolve those conflicting opinions. There was sufficient evidence here to support their conclusions. The arbitrator recites all these NIOSH readings and this is a case where the 1979 reading, which was taken three years after he started coal mining, probably should be given little weight here. That's just one of those that it's out there. And likewise, 1993, all those taken several years before he left coal mining should be given little weight. The reality is when we receive these chest x-rays or the interpretations from NIOSH when we request this evidence, they send us the form, list all the x-rays. They do their certification saying we certify these are all of the x-rays. Those all go into evidence just because that's the way NIOSH has certified them as these are the NIOSH records. So rather than us going through and saying, okay, we're only submitting the last one or two ones that should be given greater weight, they all go in and call into evidence. Well, you can offer into evidence anything and get it in and have some objection. It comes in, it's not objected to. Right. And there have been times in the past, I think long ago, it's not in current cases, but where there were objections over whether those records were certified and we just feel it's put it all in there. Well, we don't say no certification when the argument is going to be irrelevant. And again, back to the weight of those films. But again, in this one, we do have a NIOSH film that I think should be given weight by the arbitrator and was given weight. There was an x-ray performed and interpreted by NIOSH in May 2007, which was just three months before this gentleman was laid off. Right. That's not 20 years before. You can discount those. Correct. You can discount those. I would agree. In this one, when you look at the one that was three months prior to leaving coal mining, I think the evidence again shows the medical evidence is the disease of coal worker's pneumothorax is unlikely to progress once exposure ceases. I'm not saying it never does, but it's less likely. So certainly whether he had it three months before he left coal mining is relevant, because by that time he had been exposed to it for 30 plus years. Thank you. Mr. Messore keeps talking about, well, the respondent here could have had an examination within the end of that two-year period. What about that? That seems to be the common theme, and it seems to have a logical, intuitive appeal. What do you say about that? It's not the respondent's burden to prove anything. We can counter the evidence that's submitted, but it's not our burden to prove that he doesn't have it. You could do it, but you're not required to do it. Right. I mean, I guess that's – and quite honestly, would we want to? I mean, we could, but – and the fact that our experts in this case did not examine Mr. Stevens, that is – Why do you say, quite honestly, would we want to? Well, do we want to show that his condition has worsened? We don't want to find an abnormal – You're being very candid and blunt. You're advocates. You're not going to take a chance on something that would undermine your entire case, right? I mean, we can all be honest here and candid, right? Right. Like I said, we don't have a burden of proving he doesn't have it. We have to counter the evidence that they present. As far as the examination or Dr. Tudor and Dr. Rosenberg not examining Mr. Stevens, the chest X-ray doesn't matter. I mean, you don't have to have an examination to be able to interpret the chest X-ray. Whether they examined him, took a history from him, that's not going to make any difference. And that clearly goes to weight. And that goes to weight. They're not going to see anything different on a chest X-ray because they asked this gentleman about his history. You know, they know when they receive the X-ray that this is a pending case for CWP. So they assume that there's sufficient exposure. That's what you're going to have to prove CWP is the presence of colnacles, the changes on the chest X-ray, and its sufficient history of exposure. They're assuming we wouldn't send them a chest X-ray if it wasn't a coal miner who had had exposure and asked them to interpret it for CWP. So there's that assumption. So you're saying that this is interesting, that there would be no influence at all on a reader's reading and conclusion on an X-ray based upon other collateral information? Correct. And most of the readers, and I think Dr. Wyatt is one of them, he doesn't want to know anything about the other history. You know, he wants to assume that there's been sufficient exposure, and then he's going to look at the X-ray. He doesn't want to know about any other symptoms or anything. Because he knows that would influence it. That would influence it. That could influence it. So he just wants to read it. Trying to preserve his objectivity and what he feels is his objectivity. Right. And I would agree that, I mean, I would say that the experts for the employee are the same way. I don't, I would assume that they're just looking at X-rays. I don't think they're looking at medical records and certainly not examining the claimant either. With regard to the issue about Dr. Tudor and his statement that at autopsy, if you look hard enough, you will find it. Again, that puts into the law a presumption that every coal miner is going to be entitled to an award for CWP. It's still the employee's burden to prove that they have CWP. And if they don't... Wouldn't that really make things a lot simpler in industrial occupational diseases if there was that? If there was that presumption? Yes. And probably... Then all we're arguing about is a double impairment. That would be true. But I think... Doesn't that make a little more logical sense? I mean, I'm not an expert in this field at all, but if that is absolutely the case and Tudor is right, that pathologically that many years of exposure is there, it sure saved a lot of time. Logically, that would, but I think that's a question for the legislature. I mean, if that's the way they want to write the Occupational Disease Act, that every coal miner is presumed to have pneumoconiosis after... It has to be rebutted. It would have to be rebutted. And the industry and the labor industry are quite minuscule today to lobby for anything. That's... In this particular industry. Okay, we've gone full circle. Again, Mr. Resor has stood on his brief on the other diseases that are at issue. I would just point out, we would stand on our brief as well, but I don't think there's any evidence here from either the experts or the treating physician, Dr. Paul, that supports the finding that these other conditions, if present, were related to this coal dust exposure. Particularly in this case, because the one incident of asthma back in 2003, tested positive for one time, but never received any additional treatment. Subsequent testing did not reveal that. And Dr. Paul was the only one to diagnose chronic bronchitis, and his medical records that were put into evidence just did not support the history of cough, with sputum production that would support a diagnosis of chronic bronchitis. And we would ask that the Commission's decision be affirmed. Thank you. Thank you, Counsel. Counsel, you may reply. Mr. Resor, your last opportunity this week. And I'm on my last leg. You started out talking about Groundhog Day. The irony of it. The biggest irony of it, and I think this is dynamite. I hope you all remember this. I hope it's in the front of your mind as you make your decision. And I'm not going to read it again, even though it feels so good. Dr. Tudor's quote. They'll all have it. And from a practical standpoint, I want to tune in on Justice Holder's comment here. We sure could save a lot of trouble, and the employers could save a lot of money, if we all assumed they had it. Because for a CWP x-ray only case, they settle for 5%. 80% of them settle for 5%. You're talking $15,000, $18,000. You're talking about a $500 a year deal, if you prorate it over these guys' lives, in an industry where we know this hazard exists. And now Tudor's put the word to it. They're all going to have it. In fact, it makes you wonder, how much did the company pay to get here today, for a case that could have been settled for far less? So, you know, I think there is actually something to what you're saying. Thanks, Bill. It's funny, and it's valuable. Now, so was the arbitrator thorough? That's the question that comes up. Number one, the arbitrator said, why it's not any good as a B-reader, and cited cases, cited reasons why it's no good. Two, she said, Tudor is a B-reader. He's not. In fact, he's the only guy on the record that failed the B-reader test, and didn't take it again. After saying, Tudor is a B-reader, let's give him some weight, she said, Paul's not a B-reader, let's not give him any weight. Well, look, Tudor is not a B-reader because he failed. He's not a B-reader because of competence. Paul's not a B-reader because he chose not to be one. He never took the test. He says, I'm going to do this part of the exam. You get somebody else to read the exam. Yeah, ironically enough, you're in love with Tudor's cabinet, even though he failed the B-reading test. You know what's funny? What do we believe Tudor on? Well, see, they're two different topics. I can believe Tudor on what he says about the theory of CWP and disagree with him on other things. And you don't have to be a B-reader to know this. This is what a Pullman obvious would know. That's true. And by the way, Dr. Tudor is one of my best friends. Oh, really? Yes. And when I have a problem, or some of my family does, I call him and say, who should I go to? I do legal work with his son. I love it. And we disagree and fight like dogs and cats in these depositions. But one thing about Dr. Tudor is he says what's on his mind. When it comes to black love, he's 100% on the side of the company. When it comes to asbestosis, he's 100% on the side of the worker because he believes something different about that than he believes about black love. I give him a great deal of credibility, and like I said, when he says everybody's going to have it, that just means a whole lot. Now, just some specific things that Ms. Webb said here. She said, you don't need an exam to read a chest x-ray. No. But you do have to have an exam and get a timely chest x-ray to read one that has some weight. In other words, part of that exam would have been an x-ray. And if they had just waited four more months and done it, they would have had a timely x-ray. So that's why an exam is important. All the evidence in that exam is important. An IMR, a medical review, and I can't remember which person brought it up, has no weight here because, as Dr. Wyatt would say, you don't want to have any information about the guy when you read the x-ray. You just want to look at the x-ray. In fact, having knowledge about the guy can prejudice you. Therefore, when the company has a medical record review and we're talking about CWP, it's a complete waste of time and money. And I would leave that. And just ask you to look at the arbitrator crossing lines on herself. The arbitrator said, recognizes, you can get CWP after that last NIOSH x-ray. And then she uses an NIOSH x-ray to support everybody. To support Dr. Wyatt, who she says is not a good B-reader. To support Dr. Tudor, who she says is a B-reader and he's not. And to discount Dr. Paul, because he's not a B-reader. Different standards. Now, how many cases are being argued today? Not two, six. And Dr. Tudor's statement is extremely valuable for those other two cases. The one we're talking about now, the living minor claim, is fairly small. The other two mean a lot. And we know this guy's going to have CWP. Why with that evidence on the table? Do you deny? Give him a dollar. That means he lost his case. He's going to lose money for the development he had. But it keeps the others open for development of evidence if it arises. I say that this decision is too harsh. It's one that's beyond the manifest weight of the evidence. It's beyond my conscience. It's too harsh to deny all those claims based on this evidence, which I think is in favor of the claimant anyway. Thank you very much. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter. We'll be taking our advisement and a written disposition shall issue. Safe trip home.